## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
In re:                                    :    Chapter 11
                                          :
SUNTECH AMERICA, INC., et al.,            :    Case No. 15-_____ (_____)
                                          :
            Debtors.¹                     :    Joint Administration Requested
                                          :
-------------------------------------------------------- x
```

## DECLARATION OF ROBERT MOON IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1764, Robert Moon declares as follows under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of the Suntech Group,[2] which includes Suntech America, Inc., a Delaware corporation ("**Suntech America**"), and Suntech Arizona, Inc., a Delaware corporation ("**Suntech Arizona**" and together with Suntech America, as debtors and debtors in possession, the "**Debtors**").  I have served as a restructuring advisor to the Suntech Group since December 2012 and, as it relates to the Debtors, I am the CRO of Suntech America and an authorized individual of Suntech Arizona.  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.      As part of my duties as the CRO of the Suntech Group, I am responsible for overseeing the Debtors' day-to-day activities and overall restructuring efforts.  As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other representatives of the Debtors, I am generally familiar with the Debtors' financial

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' federal tax identification numbers, are Suntech America, Inc. (9235) and Suntech Arizona, Inc. (0353).  The Debtors' mailing address is 501 Second Street, Suite 575, San Francisco, California 94107.

[2]      The "**Suntech Group**" is set forth on the structure chart attached hereto as **Exhibit A**. Prior to the Wuxi Sale (as defined and described below), the Suntech Group also included Wuxi Suntech Power Co., Ltd ("**Wuxi Suntech**"), an entity formed in the People's Republic of China ("**PRC**"), and certain other entities. As such, where the context so requires, the Suntech Group includes Wuxi Suntech and such other entities.

condition, policies and procedures, day-to-day activities, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' representatives or retained advisers that report to me in the ordinary course of my responsibilities.  References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On January 12, 2015 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors will continue to manage and operate their business as debtors in possession subject to the requirements of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**").

4.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (i) voluntary petitions for relief that were filed under Chapter 11 of the Bankruptcy Code and (ii) "first day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[3]  The Debtors seek the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 cases on their day-to-day affairs and administration.  I have reviewed the Debtors' petitions and the First Day Motions, and it is my belief that the relief sought therein is essential to, among other things, successfully maximize the value of the Debtors' estates.

5.      Part I of this First Day Declaration provides an overview of the Debtors' business (including the Suntech Group's business), organizational structure, debt structure and

---

[3]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Motions.

the Suntech Group's international restructuring efforts, as well as the events leading to the Debtors' Chapter 11 filings.  Part II describes the First Day Motions and sets forth the relevant facts in support of such motions.

## PART I

### I.    General Background

#### A.    The Suntech Group

6.    Suntech Power Holdings Co., Ltd., a Cayman Island exempted company ("**Suntech Holdings**"), is the ultimate parent of the Suntech Group.  Suntech Holdings is a publically held company that was delisted from the New York Stock Exchange in February 2014 and, subsequently, was placed on the over the counter exchange.

7.    Historically, the operating subsidiaries in the Suntech Group developed, manufactured, and marketed photovoltaic ("**PV**")[4] modules and cells and provided PV system integration services[5] to customers around the world.  Prior to the Wuxi Sale (as defined and described below), the Suntech Group's primary manufacturing capacity was located in the PRC. The Suntech Group sold its solar products for residential, commercial, industrial, and utility applications throughout the Americas, Europe, Asia and the Middle East.  The Suntech Group delivered more than 25 million PV panels to over 1,000 customers in more than 80 countries.

#### B.    Suntech America

8.    Suntech America is wholly owned by Suntech ES Holdings, Inc. ("**Suntech ES**")[6] and is based in San Francisco, California.  Historically, Suntech America was the main operating subsidiary of the Suntech Group in the Americas and its primary business

---

[4]    Photovoltaic cells convert solar energy into direct current electricity using semiconducting materials.

[5]    A PV system employs solar panels composed of a number of solar cells to supply usable electrical power.

[6]    Suntech ES is a holding company that was formed to hold equity investments in United States entities.

purpose was acting as an intermediary for marketing, selling and distributing Suntech Group manufactured products. Suntech America's primary tangible assets consist of unencumbered cash in the amount of approximately $10 million, and inventory, consisting of PV modules, with a book value of approximately $6.5 million. Suntech America's books and records also reflect accounts receivables in the amount of approximately $110 million, which primarily consist of recorded intercompany obligations due to Suntech America from other members of the Suntech Group. Suntech America owns no real property and presently leases office space in San Francisco. Suntech America is currently in the process of monetizing its remaining PV module inventory using a commission-based sales force.

<strong>C.    Suntech Arizona</strong>

9.    Suntech Arizona is also directly owned by Suntech ES and is based in Goodyear, Arizona. Suntech Arizona owns no real property and leases a manufacturing facility in Goodyear (the "**Goodyear Facility**"). Prior to ceasing production in April 2013, the Goodyear Facility manufactured PV modules that it sold to Suntech America. While Suntech Arizona does not own the Goodyear Facility, it does own the manufacturing equipment housed at such facility. Other than such manufacturing equipment, Suntech Arizona owns no other significant tangible assets. Suntech Arizona's books and records also reflect intercompany accounts receivable (resulting from Suntech America's purchase of PV modules) in the amount of approximately $52.3 million. Suntech America has been paying down this receivable and Suntech Arizona has been using such amounts to fund its limited lease and utility obligations. Suntech Arizona has recently entered into an asset purchase agreement for the sale of its manufacturing equipment and will be seeking this Court's approval to move forward with the transaction.

RLF1 11367833v.1

### D.      Debt Structure and Intercompany Claims

10.      The Debtors have no secured debt.  Suntech America's books and records reflect approximately $112,000 being owed on account of third party trade payables and approximately $55.4 million being owed on account of intercompany obligations to other members of the Suntech Group.[7]  In addition, Suntech America's books and records reflect an outstanding disputed obligation to Wuxi Suntech in the approximate amount of $107.5 million, which was recorded while Wuxi Suntech was an affiliate of the Debtors.

11.      Suntech Arizona's books and records reflect approximately $2 million being owed on account of third party trade payables and approximately $16.1 million being owed on account of intercompany obligations to other members of the Suntech Group.  Suntech Arizona's books and records also reflect an outstanding disputed obligation to Wuxi Suntech in the approximate amount of $36.4 million, which was recorded while Wuxi Suntech was an affiliate of the Debtors.

12.      In addition, as is discussed in greater detail below (*see* infra II.C.), several parties, including Wuxi Suntech, have commenced lawsuits against the Debtors asserting various claims (e.g., antitrust, product liability and breach of contract claims) in both finite and nonfinite amounts and, as of the day hereof, such lawsuits are ongoing.  The Debtors dispute the validity of the claims asserted in these lawsuits.

## II.      Events Leading Up to the Chapter 11 Cases

13.      As is discussed in detail below, these Chapter 11 cases are the result, in large part, of the following:  (i) the Suntech Group's international restructuring efforts which, on

---

[7]      Similarly, as noted above, the Debtors' assets include intercompany obligations owing from other members of the Suntech Group, including approximately $65.3 million from Suntech Holdings, $32.3 million from Power Solar System Co., Ltd., a British Virgin Islands company ("**PSS**"), which is a wholly owned subsidiary of Suntech Holdings, and $5.1 million from Suntech ES.

a macroeconomic level, were the result of dramatic changes in the solar panel industry and, on a microeconomic level, the Wuxi Sale (as defined below); (ii) as it relates to the Debtors specifically, fundamental changes in the United States regulation of importation of foreign solar panels; and (iii) various litigation matters that have been a drain on the Debtors.

A.    **The Wuxi Sale and the Resulting International Restructuring Efforts**

14.    As mentioned above, the Suntech Group's primary manufacturing capacity was formerly at Wuxi Suntech in Wuxi, PRC.  At one time, the Suntech Group had over 10,000 employees at Wuxi Suntech.  However, a rapid decrease in the price of solar panels due to an expansion of Chinese solar panel manufacturing capacity as well as uncertainty concerning tariffs to be imposed by the United States Department of Commerce led to severe financial difficulties for the Suntech Group.  As a result of such difficulties, in March 18, 2013, a group of Chinese banks, allegedly owed $1.3 billion, petitioned the Wuxi Municipal Intermediate People's Court (the "**PRC Court**") in Jiangsu Province, PRC for the reorganization of Wuxi Suntech (the "**PRC Insolvency Proceeding**").  The PRC Court issued an order placing Wuxi Suntech into the PRC Insolvency Proceeding on March 21, 2013, and, on November 15, 2013, the PRC Court approved a restructuring plan that provided for the sale of all of Wuxi Suntech's assets (the "**Wuxi Sale**") to Jiangsu Shunfeng Photovoltaic Technology Co., Ltd. ("**Shunfeng**").  On April 7, 2014, the stockholders of Shunfeng approved the Wuxi Sale, and Wuxi Suntech became a wholly owned subsidiary of Shunfeng.

15.    The Wuxi Sale purported to include all of the equity interests in Wuxi Suntech and all of the stock once held by PSS in Suntech Power Investment Pte., Ltd. ("**Suntech Singapore**") and Suntech Power Japan Corporation ("**Suntech Japan**"), which stock had been transferred to Wuxi Suntech soon after Wuxi Suntech was placed in the PRC Insolvency

6

Proceeding (the "**Wuxi Share Transfer**"). As is discussed in greater detail below (*see* infra II.A.2.), the Suntech Group believes that it has significant claims against, among others, Wuxi Suntech, Suntech Singapore and Suntech Japan as a result of the Wuxi Sale and the Wuxi Share Transfer and, to that end, commenced the BVI Insolvency Proceeding (as defined and discussed below) to, among other things, investigate, and ultimately prosecute, such claims.

16.      As a result of the Wuxi Sale and the Wuxi Share Transfer, the Suntech Group no longer owns or controls Wuxi Suntech's manufacturing operations in the PRC and the Suntech Group has a dramatically reduced footprint in Asia generally and the PRC specifically. Consequently, the Suntech Group undertook a restructuring around its current activities and assets, with the intention of operating primarily as a seller and distributor of solar products using its existing international sales and distribution platforms.  A brief synopsis of the international restructuring efforts of the Suntech Group's chief companies follows.

### 1.      The Cayman Insolvency Proceeding and the Chapter 15 Case

17.      On November 5, 2013,[8] a creditor of Suntech Holdings filed a petition in the Grand Court of the Cayman Islands (the "**Cayman Insolvency Proceeding**") and requested the appointment of joint provisional liquidators in order to oversee the Suntech Group's restructuring efforts.    Ultimately, Messrs. David Walker and Ian Stokoe of PricewaterhouseCoopers were appointed as the joint provisional liquidators of Suntech Holdings (the "**JPLs**") and were authorized to oversee Suntech Holdings' restructuring efforts and have been overseeing the overall restructuring of the Suntech Group.

---

[8]      Previously, on October 14, 2013, a minority group of Suntech Holdings' noteholders commenced an involuntary case (the "**Chapter 7 Case**") against Suntech Holdings under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  On January 27, 2014, such noteholders and the JPLs, among others, entered into a restructuring support agreement that provided for, among other things, the dismissal of the Chapter 7 Case upon the recognition of the Cayman Insolvency Proceeding under Chapter 15 of the Bankruptcy Code.

18.     Following the commencement of the Cayman Insolvency Proceeding, in furtherance of the international restructuring efforts, the JPLs commenced a Chapter 15 bankruptcy case in the United States Bankruptcy Court for the Southern District of New York (Case No. 14-10383) (the "**Chapter 15 Case**"), seeking recognition of the Cayman Insolvency Proceeding as a foreign main proceeding.

19.     On December 4, 2014, the Bankruptcy Court entered an order recognizing the Cayman Insolvency Proceeding as a foreign main proceeding.  The Cayman Insolvency Proceeding is currently ongoing and the Chapter 15 Case remains open.

### 2.    The BVI Insolvency Proceeding

20.     On November 14, 2013, Suntech Holdings passed a written resolution placing PSS into voluntary liquidation in the British Virgin Islands (the "**BVI Insolvency Proceeding**").  The JPLs caused PSS to enter into the BVI Insolvency Proceeding to, among other things, investigate the Wuxi Share Transfer and, relating to such transfer, commence claims and causes of action against, among others, Wuxi Suntech, Suntech Singapore and Suntech Japan.  To that end, in October 2014, the joint voluntary liquidators in the BVI Insolvency Proceeding commenced a recovery action against Suntech Singapore, Suntech Japan, Wuxi Suntech and Fast Fame Global Limited, a company incorporated in the British Virgin Islands ("**Fast Fame**"),[9] and, in such action, asserted that, under the applicable law of the British Virgin Islands, the Wuxi Share Transfer constituted a transaction at undervalue in respect of Suntech Japan and an unfair preference in respect of Suntech Japan and Suntech Singapore. Such action, along with the BVI insolvency proceeding, is ongoing.

---

[9]     Fast Fame was named as a defendant in this action on the basis that the entire equity of Suntech Singapore was subsequently transferred from Wuxi Suntech to Fast Fame for the purported consideration of $1.

3. **The Swiss Insolvency Proceeding**

21.     Suntech Power International Ltd. ("**SPI**"), an entity incorporated in Switzerland, which is an indirect subsidiary of PSS, acts as the Suntech Group's principal operating subsidiary in Europe and is substantially responsible for the Suntech Group's sales to its European customers.  SPI also owns 100% of the equity of Suntech ES, which, as mentioned above, owns 100% of the equity interests in the Debtors.

22.     On April 8, 2013, SPI commenced an insolvency proceeding (the "**Swiss Insolvency Proceeding**") in the Cantonal Court (the "**Swiss Court**") in Schaffhausen, Switzerland.   During the Swiss Insolvency Proceeding, SPI was able to formulate its restructuring plan in the form of a "Swiss composition plan and dividend agreement" (the "**Dividend Agreement**"), which was approved by SPI's creditors on June 10, 2014. Accordingly, on July 16, 2014, the Swiss Court approved the Dividend Agreement and such agreement became effective on August 8, 2014.

23.     On August 8, 2014, SPI emerged from the Swiss Insolvency Proceeding as a solvent member of the Suntech Group.  Further, as of the date hereof, SPI has distributed dividends to all holders of claims that were settled in connection with the Dividend Agreement and is in the process of adjudicating certain contested claims.

4. **The Debtors' Role in the Restructuring**

24.     Throughout the restructuring process that began with the PRC Insolvency Proceeding, the Suntech Group believed it could continue to sell and distribute solar panels in the Americas through Suntech America.  Thus, it was believed that the success of the Debtors was critical to the success of the Suntech Group.  However, as is discussed below, Suntech America had no readily available and consistent source of solar panels to sell and distribute due to the

imposition of extraordinarily high tariffs by the United States Department of Commerce on solar panels originating from China.

**B.      Fundamental Changes in the U.S. Regulation of Importation of Foreign Solar Panels**

25.      Historically, the Suntech Group's core business model focused on manufacturing PV solar modules, which it imported and exported worldwide.  However, following the Wuxi Sale, the Suntech Group's manufacturing capacity was transferred to Shunfeng.  Accordingly, the Suntech Group's international restructuring efforts have, as previously indicated, focused on shifting its global footprint in the solar industry from a manufacturer of solar panels to a seller and distributer of solar panels.

26.      In an effort to bolster the United States solar industry, the United States Department of Commerce has implemented certain anti-dumping tariffs ("**AD Tariffs**") and countervailing duty tariffs ("**Countervailing Duty Tariffs**", and together with the AD Tariffs, the "**Tariffs**").  Generally, AD Tariffs are taxes imposed on imported goods that are considered priced below the market, and Countervailing Duty Tariffs are taxes imposed on imported goods that are priced below the market due to subsidies from foreign governments.

27.      In the Debtors' case, the extraordinarily high Tariffs made it no longer economically feasible for the Suntech Group to continue to import, sell and distribute solar panels in the Americas.  This, combined with the litigation drain described below, resulted in the commencement of these Chapter 11 cases.

**C.      The Litigation Drain**

28.      The Debtors currently are named parties to several separate lawsuits in forums across the United States, and a general description of the significant lawsuits are discussed below (collectively, the "**Litigation**").

1.      **The Antitrust Litigation**

29.     Suntech America is a party to two separate antitrust lawsuits (together, the "**Antitrust Litigation**").   One such lawsuit was commenced by Solyndra Residual Trust, by and through its liquidating trustee, R. Todd Neilson ("**Solyndra**"), and another such lawsuit was commenced by Energy Conversion Devices Liquidation Trust, by and through its liquidating trustee, John Madden ("**ECD**").   The aggregate value of the damages sought against all of the defendants in the Antitrust Litigation is approximately $2.5 billion.

30.     In October 2012, Solyndra, a former solar panel manufacturer located in California, filed a complaint against, among others, Suntech Holdings and Suntech America in the United States District Court for the Northern District of California, alleging violations of the Sherman Act, California Cartwright Act, California's unfair competition laws as well as claims for tortious interference.  Solyndra, among other things, claimed that Suntech Holdings, Suntech America and the other defendants acted in concert to fix prices in order to dominate the United States solar panel market for the purpose of driving Solyndra and other United States manufacturers out of business.  The Solyndra litigation is ongoing and a trial date is set for October 5, 2015.

31.     In October 2013, ECD, a solar panel manufacturer based in Michigan, filed a complaint in the United States District Court for the Eastern District of Michigan, Southern Division, against, among others, Suntech Holdings and Suntech America asserting violations of the Sherman Act and Michigan's Antitrust Reform Act.  As with the Solyndra litigation, ECD alleged that Suntech America and the other defendants spearheaded a price-fixing scheme in order to sell their solar panels in the United States at fixed prices in order to force ECD out of business.  Due to the perceived weakness of the ECD litigation, Suntech

America and the other defendants filed motions to dismiss the case.  The District Court granted such motions on October 31, 2014, thereby dismissing the ECD litigation.  However, ECD filed a motion to reconsider such dismissal.  As of the date hereof, such motion is fully briefed and under advisement by the District Court.

### 2.    The Wuxi Suntech Litigation

32.    In July 2014, Wuxi Suntech filed suit against Suntech Arizona in an Arizona state court, alleging breach of contract in connection with the purchase of certain solar products from Wuxi Suntech.  The complaint seeks damages of $36.4 million, and the Debtors dispute the validity of this claim. Suntech Arizona has engaged in discovery and, in the near term, intended to meet and confer with Wuxi Suntech to enter into a pre-trial scheduling order.

### 3.    The Products Liability Litigation

33.    Suntech America is a co-defendant in three separate lawsuits in California state courts, alleging products liability and warranty claims in connection with roof-tile solar panels designed by a third party and sold by Suntech America.  These cases are currently in mediation; however, discovery requests have been served in two of the lawsuits.

### III.    Anticipated Chapter 11 Process

34.    The Debtors' chapter 11 cases were filed as part of a coordinated, global effort in connection with the Suntech Group's complex international restructuring.  As the CRO, I have been involved with, or am otherwise familiar with, each such insolvency proceeding, and it is my view that these Chapter 11 cases represent the necessary, next (and near last) step in that coordinated restructuring process.

35.    The Chapter 11 cases are necessary at this juncture for the Suntech Group to continue to progress towards finalizing their international restructuring.  As noted above, the Suntech Group already is, or has been, subject to insolvency proceedings in China, Europe, the

Cayman Islands and the British Virgin Islands, and now is in a position to focus on expeditiously and efficiently resolving its affairs in the United States. These Chapter 11 cases will afford the Debtors and the Suntech Group that opportunity by (i) providing the Debtors with a necessary breathing spell from the various litigation and creditor matters they face and (ii) allowing the Suntech Group to maximize the value of its remaining U.S.-based assets in an efficient and market-tested manner and, if sufficient funds exist following satisfaction of allowed claims, to distribute any remaining funds to members of the Suntech Group in their capacity as the Debtors' equity holders.

36.     In an effort to finalize these Chapter 11 cases and to continue progressing the Suntech Group's international restructuring efforts as expeditiously as possible, the Debtors intend to file a disclosure statement and plan of liquidation in the near term.  In my view, through these Chapter 11 cases, the Suntech Group will be one step closer to finalizing its international restructuring.

## PART II

37.     As part of these cases, the Debtors are seeking approval of the First Day Motions and related orders (the "**Proposed Orders**").

38.     I have reviewed each of the First Day Motions, Proposed Orders and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (i) is vital to enabling the Debtors to make the transition to Chapter 11 with minimum disruption and (ii) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

**I.      Motion for Joint Administration of the Debtors' Chapter 11 Cases**

39.      The Debtors seek the joint administration of their Chapter 11 cases, two (2) in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in the Chapter 11 cases will affect both Debtors.  Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

**II.     Section 156(c) Application**

40.      The Debtors filed a motion (the "**Section 156(c) Application**") contemporaneously herewith to retain UpShot Services LLC ("**UpShot**"), as claims and noticing agent pursuant to Sections 105(a), 156(c), and rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). UpShot is a leading chapter 11 administrator, with significant experience in noticing, claims administration, solicitation, balloting, and other administrative aspects of Chapter 11 cases.  Appointing UpShot as the claims and noticing agent in the Chapter 11 cases will relieve the administrative burden on the Clerk of the Bankruptcy Court for the District of Delaware (the "**Clerk**").

41.      The Debtors' selection of UpShot to act as the claims and noticing agent has complied with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that UpShot's rates are competitive and reasonable given UpShot's

14

quality of services and expertise. The Section 156(c) Application pertains only to the work to be performed by UpShot under the Clerk's delegation of duties permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by UpShot outside of this scope is not covered by the Section 156(c) Application or by any order granting approval thereof. A separate retention application addressing UpShot's services beyond Section 156(c) of the Bankruptcy Code will be filed by the Debtors in the near future.

### III.    Motion Authorizing the Continued Use of the Debtors' Cash Management System

42.    The Debtors also have filed a motion (the "**Cash Management Motion**"), pursuant to sections 105(a), 345(b) and 363(c) of the Bankruptcy Code, requesting the entry of an order: (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under the cash management system or (b) any action taken by the Debtors in accordance with any order granting this Motion or any other order entered in the Debtors' Chapter 11 cases; and (iii) granting the Debtors additional time to comply with Section 345 of the Bankruptcy Code.

43.    In the ordinary course of their businesses, the Debtors maintain a cash management system (the "**Cash Management System**"). The Cash Management System is an ordinary course, customary and essential business practice and allows the Debtors to efficiently identify the Debtors' cash requirements and efficiently monitor and control all of the Debtors' cash receipts and disbursements. The Cash Management System is similar to those utilized by

15

many other companies of comparable size and complexity to collect, transfer and disburse funds in a cost-effective and efficient manner.

44.    The continued use of the Cash Management System during the pendency of the Chapter 11 cases is essential to the Debtors' viability in Chapter 11 and their goal of maximizing value for the benefit of all parties in interest.  Requiring the Debtors to adopt new cash management systems at this early and critical stage would impose needless administrative burdens and cause undue disruption.  Any such disruption would adversely affect the Debtors' ability to maximize estate value for the benefit of creditors and other parties in interest. Moreover, such a disruption would be wholly unnecessary insofar as the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements.  Maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System and their existing bank accounts.

45.    To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtor in possession; provided, however, that in the event the Debtors generate new checks during the pendency of these cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession."

46.    As is set forth in the Cash Management Motion, the Debtors need time to consult with the United States Trustee in order to determine whether their Cash Management System is currently in compliance with the requirements of section 345(b) of the Bankruptcy

Code and/or whether the Debtors need to take any further action to bring their Cash Management System into compliance with such requirements. The Debtors are therefore requesting a sixty (60) day extension of their time to comply with the requirements of section 345(b) of the Bankruptcy Code.

47.     In sum, I believe that the continued operation of the Debtors' Cash Management System is in the best interests of the Debtors' estates and creditors, will avoid immediate and irreparable harm to the Debtors, and is both necessary and appropriate to further the reorganization policy of Chapter 11.

## IV.    **Workforce Obligations Motion**

48.     The Debtors have also filed a motion (the "**WorkForce Obligations Motion**") pursuant to sections 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rule 6003 seeking the entry of an order authorizing them, in their discretion, to pay, continue or otherwise honor various prepetition Workforce-related (as defined below) obligations (collectively, the "**Prepetition Workforce Obligations**") to or for the benefit of their (i) full-time regular employees (the "**Employees**"), (ii) persons who are contracted to supplement the workforce and are paid on an hourly basis, (the "**Contractors**") and (iii) persons whose compensation is based on sales commissions (the "**Commission Contractors**", together with the Employees and Contract Employees, the "**Workforce**"). The Debtors request that the Court confirm their right to continue each of the Workforce programs in the ordinary course during the pendency of these Chapter 11 cases in the manner and to the extent that such Workforce programs were in effect immediately prior to the filing of such cases

and to make payments in connection with expenses incurred in the postpetition administration of any Workforce program.[10]

49.    The Workforce programs under which the Prepetition Workforce Obligations arise are described more fully in the Workforce Obligations Motion and include, plans, programs, policies and agreements providing for (i) wages, salaries, paid time off and other accrued compensation; (ii) reimbursement of business, travel, and other reimbursable expenses; and (iii) benefits in the form of medical, dental and vision coverage, coverage continuation under COBRA, basic term life, supplemental life, accidental death and dismemberment, short-term disability, long-term disability, workers' compensation, and miscellaneous other benefits provided to the full-time Employees in the ordinary course of business.

50.    The Workforce Obligations Motion also seeks authorization to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes and Medicare taxes.  In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from Employee paychecks by the Debtors for payments on behalf of Employees for benefit plans, insurance programs and other similar programs for similarly required deductions.  With respect to any Workforce programs and Prepetition Workforce Obligations that are administered, insured or paid through a third-party administrator

---

[10]    Suntech America provides one Employee with a severance package (the "**Severance Program**") entitling such Employee to payment in the event that the Employee is terminated.  The Severance Program is based on the Employee's length of service, position with the Debtors and salary at the date of termination. As is set forth in greater detail in the WorkForce Obligations Motion, the Debtors believe that any severance payment to such Employee would be in compliance with Section 503(c) of the Bankruptcy Code. By the Workforce Obligations Motion, the Debtors seek authority, but not direction, to continue the Severance Program. However, the Debtor is only seeking authority to continue the Severance Program upon then entry of a final order with respect to the Workforce Obligations Motion.  The Debtors intend to work with the Office of the United States Trustee and any statutory creditors' committee to ensure that the Severance Program is in compliance with Section 503(c) of the Bankruptcy Code.

18

or provider, the Debtors request authorization, in their discretion, to pay any prepetition claims of such administrator or provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

51.    As of the Petition Date, Suntech America has two (2) full time Employees, five (5) Contractors who assist primarily with the logistics of the sales process, four (4) Commission Contractors whose sole function is to sell the Debtors' remaining inventory and one (1) contract attorney that provides the Debtors with general legal services.  Suntech America compensates such contract attorney, its Employees, Contractors and Commission Contractors an average of $81,200 per pay period, consisting of approximately $21,000 for Employees, $17,000 for Contractors, $39,500 for Commission Contractors,[11] and $3,700 for the contract attorney.

52.    The Debtors' ability to successfully maximize the value of the estates is dependent on the expertise and continued dedication and service of the Workforce.  The Workforce has unique knowledge about the Debtors, their industry and the international restructurings of the Debtors' global affiliates.  Any attempt to replace the Workforce would be costly, time consuming and would hinder the Debtors' Chapter 11 cases and the coordinated efforts of the Suntech Group's international restructuring.  Therefore, the Debtors have determined that relief requested herein is in the best interests of their estates.

**V.    Motion Seeking Relief With Respect to the Debtors' Utilities Companies**

53.    In the Debtors' utilities motion (the "**Utilities Motion**"), the Debtors request entry of interim and final orders approving procedures that would provide adequate assurance of payment to their utility service providers (the "**Utility Companies**") under Bankruptcy Code section 366, while allowing the Debtors to avoid the threat of imminent

---

[11]    Commission payments to Commission Contractors may fluctuate depending on the total sales such Commission Contractors generate and whether sale proceeds are actually received, as described in the Workforce Obligations Motion.

termination of their utility services (collectively, the "**Utility Services**") from those Utility Companies.  Specifically, the Debtors request entry of interim and final orders (i) approving the Debtors' deposit of $4,427 (which is approximately 50% of the estimated monthly cost of the Utility Services based on historical averages) into a newly created, segregated, account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code Section 366(b), (ii) approving the additional adequate assurance procedures described below as the method for resolving disputes regarding adequate assurance of payment to Utility Companies, and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing services to or discriminating against the Debtors except as may be permitted by the proposed procedures.

54.     As of the Petition Date, three Utility Companies provide Utility Services to the Debtors at their facilities.  I have been informed that, on average, prior to the Petition Date, the Debtors spent approximately $8,855 each month on utility costs and generally made timely payments of utility costs.  As of the Petition Date, the Debtors have unpaid, outstanding balances owed to the Utility Companies of approximately $16,571.

55.     The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors have proposed certain routine protections and procedures in the Utilities' Motion.

## VI.    **Shippers and Warehousemen Motion**

56.     The Debtors also have filed a motion (the "**Warehousemen Motion**") seeking authority to pay, in their discretion, the  prepetition shipping, warehousing and related claims (all such claims, the "**Distribution Claims**") that are owed, either directly or indirectly, to

(i) certain third-party shippers, haulers, common carriers and other transporters (the "**Shippers**") and (ii) warehousemen (the "**Warehousemen**", and collectively with the Shippers, the "**Distribution Vendors**"), to the extent the Debtors determine, in the exercise of their business judgment, that such payments are necessary or appropriate to (a) secure the storage, delivery, distribution and sale of the Debtors' inventory (consisting of solar panel modules) or (b) satisfy liens, if any, in respect of amounts owed to such parties.  The Debtors estimate that the aggregate amount of Distribution Claims to be paid pursuant to this Motion is approximately $65,000.

57.    In the ordinary course of their businesses, the Debtors pay (i) certain Shippers in connection with the delivery of products and inventory (consisting of solar panel modules) and (ii) the Warehousemen to store such inventory, as necessary.  The Debtors utilize the Shippers in the ordinary course to transport and deliver their inventory to various locations across the country.  The Debtors also utilize warehouses in Arizona, California and New Jersey to store such inventory.  The warehouse in Arizona is operated by Bekins Moving Solutions, Inc. and the warehouses in California and New Jersey are operated by Logistics Plus, Inc.  The Debtors depend on such warehouses to fulfill necessary storage requirements for their inventory needs.

58.    It is my understanding that if the Distribution Claims are not paid, the Distribution Vendors could assert possessory or other liens on the inventory currently in their possession if these entities' prepetition claims are not paid.  Further, I have been informed that the perfection and maintenance of such liens would be, in most cases, dependent upon possession — the Distribution Vendors therefore would likely refuse to deliver or release such inventory until their claims have been satisfied and the liens released.  The value of the inventory generally exceeds the amount of the outstanding Distribution Claims and, thus, the Debtors believe that

most of the Distribution Vendors will ultimately be entitled to be paid in full for the Distribution Claims.  However, I believe that the mere assertion of possessory or other liens could delay and interfere with the Debtors' use of their inventory in the ordinary course of their business and restructuring efforts.

59.     Furthermore, I believe that if the Distribution Claims are not paid, the Distribution Vendors may refuse to perform additional services for the Debtors.  In such event, the Debtors could incur significant additional expenses to replace these parties, which amounts likely would exceed the amount of unpaid Distribution Claims that the Debtors request permission to pay in connection with the Warehousemen Motion.

60.     It is my understanding that in return for payment of the Distribution Claims as described herein, except in possessory lien situations described in paragraph 5(d) of the Warehouseman Motion, the Distribution Vendors would be required to continue to supply the Debtors on the Customary Terms during the pendency of these Chapter 11 cases.  I believe that such Customary Terms will maintain the credit terms that the Debtors had prior to the Petition Date.  It is my understanding that by agreeing to provide the Customary Terms, the Distribution Vendors are extending unsecured postpetition credit to the Debtors for the benefit of all creditors.  Accordingly, I believe that the payment of the Distribution Claims, on the terms and conditions proposed herein, in exchange for the Customary Terms is in the best interests of the Debtors and their estates.

61.     It is my understanding that, in the Shipping Motion, the Debtors propose that if any Distribution Vendor accepts payment and thereafter does not continue to provide services to the Debtors on such Customary Terms, then any payment of the Distribution Claims made under this Motion to such Distribution Vendor would be deemed an unauthorized

postpetition transfer under Section 549 of the Bankruptcy Code and, therefore, may be avoidable and recoverable by the Debtors, subject to a Distribution Vendor's right to contest such treatment and request that the Debtors schedule a hearing on such matter.  Upon any recovery by the Debtors, the Distribution Vendor's claim would be reinstated as a prepetition claim in the amount so recovered, less the Debtors' reasonable costs in recovering such amounts.

62.    I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful, efficient and timely liquidation of the Debtors' assets for the benefit of all of the Debtors' creditors will be substantially enhanced.

## <u>CONCLUSION</u>

63.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

RLF1 11367833v.1

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _12th_ day of January, 2015.

Suntech America, Inc., et al.
*Debtors and Debtors in Possession*

_____
Robert Moon
Chief Restructuring Officer